# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Y.T.D., | Case No. 1:25-CV-01100 JLT SKO |
| Petitioner, | ORDER RE PRELIMINARY INJUNCTION[2] |
| v. | (Doc. 2) |
| TONYA ANDREWS, in her official capacity as Facility Administrator of Golden State Annex Detention Facility,[1] et al., | |
| Respondents. | |

## I.   INTRODUCTION

Petitioner Y.T.D. is a 28-year-old citizen of Ethiopia, (Doc. 1, ¶ 1), who fled his native country after experiencing repeated detentions, beatings, and torture there because of his ethnic background. (*Id*., ¶ 32; Doc. 17 (Y.T.D. Affidavit), ¶ 4.) At one point, the police held and tortured him for three months, during which time they broke his teeth and beat him so seriously that he was left with scars. (Doc. 17, ¶ 4.) When the police released him, they warned him that if they

---

[1] On August 29, 2025, the date on which Y.T.D. filed this Petition, he was being held at Golden State Annex, in Bakersfield, California, but on August 31, 2025, he was transferred to the California City Detention Facility in California City, California, which is also within this judicial district. (*See* Doc. 14-1, ¶ 8.)

[2] Upon the agreement of the parties (*see* Doc. 21), the Court converts the motion for temporary restraining order into one for preliminary injunction. Respondents had notice, opportunity to respond and be heard. Additional briefing is not required and the standard for a TRO and a preliminary injunction is the same. As such, given the nature of the relief granted by this order and to allow Respondents to appeal should they choose, the Court converts this to a Motion for Preliminary Injunction.

1 ever saw him again, they would kill him. (*Id*.)

2 Y.T.D. fled to the United States, crossing the southern border without inspection on or about May 27, 2024. (Doc, 18 (Notice to Appear) at 2).³ Thereafter, he was taken into custody where he has remained. (Doc. 17, ¶¶ 6–7.) On July 1, 2024, he was given a Notice to Appear in "removal proceedings under section 240 of the Immigration and Nationality Act." (Doc. 18 at 2.) October 2024, he was denied parole due to concerns of flight risk. (Doc. 20 (Request for Release) at 2.) He was involved in one incident in detention in which he is alleged to have "assaulted staff," but he denies touching any officer and the incident is "still under investigation." (*Id*. at 2–3.)⁴

On January 6, 2025, an Immigration Judge (IJ) concluded Y.T.D. was entitled to withholding of removal to Ethiopia (i.e., that he may not be deported to Ethiopia). (Doc. 19 at 4.) It is undisputed that this order became final on February 6, 2025.⁵ (*Id*. at 5; Doc. 1, ¶ 2.)

According to Petitioner, ICE has been telling him "for a long time" that they will try to deport him to a country other than Ethiopia. (Doc. 20, ¶ 10.) Kenya, Eritrea, Somalia, and Benin were mentioned. (*Id*., ¶ 11.) Petitioner indicates he has no ties to any of those countries, and generally that he would fear removal to them because he believes he would be persecuted, tortured or otherwise subject to abuse in those countries as well. (*Id*., ¶ 12.) Petitioner further explains his concerns about removal to these countries as follows:

---

³ Under President Biden's Circumvention of Lawful Pathways Final Rule, individuals who entered the United States through a country other than their origin country—i.e. individuals from countries other than Mexico who entered through the southern border—without inspection from May 10, 2023 through May 10, 2025, were presumptively ineligible for asylum unless they qualified for one of several, narrow exceptions, including "if, at the time of entry, the noncitizen or a member of the noncitizen's family with whom they are travelling had an acute medical emergency, faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder, or satisfied the definition of 'victim of a severe form of trafficking in persons' provided in 8 CFR 214.11(a). The presumption also may be rebutted in other exceptionally compelling circumstances." *See* 88 Fed. Reg. 31,314, (May 16, 2023); 8 C.F.R. § 208.33(a). There are fewer restrictions on eligibility for withholding of removal. *Id*. § 1231(b)(3)(B)(iii).

⁴ In a declaration Petitioner attached to his request for release, he states: "When I was lifting weights, I put one of the weights down and an officer said something in Spanish that I did not understand and tried to pull it away from me. I tried to pull it back but when she insisted on pulling it, I let it go. I never touched her or did anything to her. . . . I was simply trying to get my weight back. I am not a violent person and I do not believe in violence." (Doc. 20 at 17.)

⁵ If withholding or CAT relief is granted, either party has the right to appeal that decision to the BIA within 30 days. *See* 8 C.F.R. § 1003.38(b). If both parties waive appeal or neither party appeals within the 30-day period, the withholding or CAT relief grant and the accompanying removal order become administratively final. *See* 8 C.F.R § 1241.1.

2

> The United States Department of State issues Country Reports on Human Rights Practices for various countries. . . . For example, in its most recent report on Eritrea, the State Department determined Eritrea is plagued by "significant human rights issues" including "disappearances; torture or cruel, inhuman, or degrading treatment or punishment; arbitrary arrest or detention." Exhibit 16 (Eritrea Country Report) at 1. The State Department also found Eritrea "did not recognize Ethiopians . . . as refugees," and even if it did, "the government had no established system for providing protection to refugees." *Id*. at 13. The situation for Ethiopians is especially fraught because "at any moment, war between Ethiopia and Eritrea could break out" over territorial and ethnic conflict. Exhibit 17 (Al Jazeera Article – Are Ethiopia and Eritrea hurtling towards war) at 8. The State Department made similar human rights abuse findings for Benin, Kenya, and Somalia. Exhibit 18 (Benin Country Report); Exhibit 19 (Kenya Country Report); Exhibit 20 (Somalia Country Report). Most recently, "Ethiopians living in Somalia have become the subject of physical violence, verbal threats and intimidation since Somaliland consented to give Ethiopia access to its coastline" in 2024. Exhibit 21 (VOA Article – Ethiopian Refugees in Somalia Fear Violence Over Deal With Somaliland) at 1. Further, based on the statements and actions of countries that have recently accepted third country removals from the United States, Y.T.D. would likely succeed on the claim that these countries would repatriate him to Ethiopia where he would face torture and/or persecution, in violation of U.S. and international refugee law. Exhibit 22 (NYT Article – African Nation Says It Will Repatriate Migrants Deported by U.S.) at 2 (Eswatini repatriating deportees); Exhibit 23 (Reuters Article – The US said it had no choice but to deport them to a third country. Then it sent them home) at 2 (Libya repatriating deportees).

(Doc. 2, ¶ 40.) As of the date of the filing of the instant case, Petitioner had not been interviewed about his fear of going to Kenya, Eritrea, Somalia, or Benin. (Doc. 20, ¶ 11.)

Y.T.D. further indicates that prolonged detention has had deleterious impacts on his mental and physical health. (Doc. 20, ¶ 14.) He does not speak English or Spanish and thus most of the officers do not understand him. (*Id*.) He is suffering from feelings of depression due to isolation. (*Id*.) The uniforms of the staff match the uniforms of officials in Ethiopia who tortured Petitioner, so seeing the uniforms gives him nightmares. (*Id*.) He also has physical pain in his shoulder and teeth due to the torture he experienced. (*Id*., ¶ 15.)

On July 30, 2025, Y.T.D., through counsel, submitted a request for release to the Department of Homeland Security. (Doc. 1, ¶ 36; Doc. 20.) In that request, Y.T.D. argued that his removal is "not practicable, he is nonviolent, and does not pose a significant flight risk." (Doc. 20 at 3.) Specifically, he contends that his removal is "not imminent" because he fears removal to the

1 countries he has been informed he may be removed to: Benin, Eritrea, Somalia, and Kenya." (*Id.*
2 at 4.) He also argued that his release would be justified for urgent humanitarian reasons because
3 of the trauma he endured in his home country which, according to Petitioner "continues to be
4 triggered at the detention facility because the officials wear the same color uniform," as well as
5 his ongoing dental issues. (*Id.*) To date, DHS has not responded to the request for release. (Doc.
6 1, ¶ 39.) Also on July 30, 2025, an ICE officer apparently told Y.T.D. he was not being
7 considered for release but instead "his file was received by ICE headquarters" (Doc. 1, ¶ 39; Doc.
8 17, ¶ 18.) It is undisputed that Y.T.D. has no criminal record in any country. (*Id.*, ¶ 16.) He
9 wishes to live with his uncle in Colorado who is a U.S. Citizen and who is willing to sponsor him.
10 (*Id.*, ¶ 17.)

11 To date, Respondents have failed to secure acceptance of Y.T.D.'s removal to any third
12 country. (*See* Doc. 1 ¶ 35.) Even if Respondents secured necessary approvals from Benin, Eritrea,
13 Somalia, or Kenya, Y.T.D. indicates that he would move to re-open his immigration case and
14 apply for fear-based protection and withholding of removal as to any of those countries. (*See* Doc.
15 20 at 4.) Y.T.D. already expressed his fear of removal to each of the four countries to
16 Respondents. (*Id.*) In response to these assertions, Respondents indicate "the government is
17 actively seeking to remove [Petitioner] from the United States," (Doc. 14 at 2), but give no further
18 details.

19 On August 29, 2025, Y.T.D. filed a petition for writ of habeas corpus alleging that his
20 detention constitutes a violation of the 8 U.S.C. § 1232(a)(6), the Administrative Procedure Act
21 (APA), and the Fifth Amendment's right to due process. (Doc. 1, ¶¶ 79–84.) He seeks a
22 declaration of the violation of his statutory and constitutional rights; and immediate release from
23 custody or, alternatively, a review of his custody under the standard articulated in DHS policy.
24 (Doc. 1 at 33.) Numerous exhibits, several of which are sealed, accompany the petition. (*See* 1-1–
25 1-21; Docs. 17–20.)

26 On the same day, he also filed an ex parte motion for a temporary restraining order. (Doc
27 6.) In that motion, he argues that his continued detention is statutorily and constitutionally
28 unlawful because his removal is not reasonably foreseeable and that his continued detention

4

1  without custody review is inconsistent with ICE policy and violates the APA and due process. (*Id*.
2  at 22–28.) He seeks immediate release and an injunction barring Respondents from removing him
3  from the District or, "at least, removing Y.T.D. via third country deportation without providing
4  him and his counsel meaningful notice and opportunity to assert a fear-based claim" including at
5  least 10 days to assert a fear-based claim and 15 days to seek re-opening of his immigration
6  proceedings if he is found not to have demonstrated reasonable fear of removal to the identified
7  third country. (*Id*. at 32.)

8  Respondents oppose Y.T.D.'s request for immediate release and maintain that Petitioner is
9  not likely to succeed on the merits of his claims that relate to that request. (Doc. 14.) Respondents
10 assert that Petitioner has not met his burden of showing there is no significant likelihood of
11 removal in the reasonably foreseeable future. (*Id*. at 1.) Instead, Respondent asserts, that DHS is
12 "actively working with the Department of State to identify a third country of removal for
13 Petitioner." (Doc. 14-1 (Declaration of Deportation Officer Sellenia Olson), ¶ 9.) Respondents
14 also maintain that Petitioner's APA claim is without merit because they are under no obligation to
15 provide him with the custody review he asserts is required—at least not on the timeline he
16 demands. (Doc. 14 at 6–8.) Finally, Respondents suggest that this Court lacks Article III
17 jurisdiction over Petitioner's demand for a declaration as to his notice rights in relation to third
18 country removals, asserting that "ICE fully understands that prior to any removal to an alternative
19 country other than Ethiopia, petitioner must be provided notice, an opportunity to claim fear, and,
20 if fear is claimed, an opportunity to have that claim adjudicated." (Doc. 14 at 8–9; *see also* Doc.
21 14-1, ¶ 10.) However, at the hearing on the pending motion, which took place September 12,
22 2025 via Zoom video conference (*see* Doc. 23), Respondents affirmatively ask the Court to order
23 a bond hearing take place within 30 days and indicate that Petitioner will not be removed to a
24 third country without notice.

25 For the reasons set forth below, the Court converts the request for a temporary restraining
26 order into a request for a preliminary injunction and **GRANTS** the motion **IN PART**.

27 **II.    LEGAL BACKGROUND**

28 In the interest of expedience, the Court relies here, as relevant, on the legal background

accurately presented by the district court in *D.V.D. v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 355 (D. Mass. 2025):

> [] Removal Proceedings
>
> When the Government wants to remove an individual, the normal path is through removal proceedings, requiring an evidentiary hearing before an Immigration Judge ("IJ"). 8 U.S.C. § 1229a. Removal proceedings determine not only whether an individual may be removed from the United States but also to where he may be removed. In the first instance, the alien is entitled to select a country of removal. *Id*.; 8 U.S.C. § 1231(b)(2)(A); 8 C.F.R. § 1240.10(f). If the alien does not do so, the IJ will designate the country of removal and may also designate alternative countries. 8 C.F.R. § 1240.10(f).
>
> Meanwhile, the alien is also entitled to seek various protections, including asylum, withholding of removal, and Convention Against Torture ("CAT") protections. 8 C.F.R. § 1240.11(c)(1). Some of these protections are discretionary. Others are mandatory, meaning that protection must be given if the conditions are met. Withholding of removal is a mandatory form of protection preventing deportation to the country or countries where an IJ finds that the individual is more than likely to be persecuted. *See* 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16; *see also Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013) ("[T]he Attorney General has no discretion to deny relief to a noncitizen who establishes his eligibility [for withholding of removal or CAT protections]."). CAT protection is a mandatory protection against deportation to a country where the IJ finds that the individual is likely to be tortured. *See* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681–822 (1998) (codified as Note to 8 U.S.C. § 1231); 8 C.F.R. §§ 208.16–18, 1208.16–18; 28 C.F.R. § 200.1; *see also Moncrieffe*, 569 U.S. at 187 n.1.
>
> \*\*\*
>
> While in [this] process[] aliens are barred from pursuing nearly all avenues of relief from removal, aliens may still seek protection through withholding of removal under 8 U.S.C. § 1231(b)(3) and CAT. 8 C.F.R. §§ 238.1(f)(3), 241.8(e). If the alien demonstrates a reasonable fear of persecution or torture, the alien is placed in "withholding-only proceedings" before an IJ where they can only seek withholding of removal and/or CAT protection. 8 C.F.R. §§ 208.31(b), (e); *see also* 8 U.S.C. § 1231(a)(5) (providing that an alien subject to reinstatement "is not eligible and may not apply for any relief under [the Immigration and Nationality Act ("INA")]"); 8 C.F.R. § 1208.2(c)(3)(i) ("The scope of review in [withholding-only] proceedings ... shall be limited to a determination of whether the alien is eligible for withholding or deferral of removal.").
>
> Withholding of removal and CAT protection only affect to where the alien may be removed, rather than whether the alien may be removed; thus, even if an alien prevails on his withholding or CAT claim, the removal order remains valid and enforceable, albeit not

> executable to the specific country as to which the alien has demonstrated a likelihood of persecution or death. *See* 8 U.S.C. § 1231(b)(2)(E); 8 C.F.R. § 1208.16(f); *Johnson v. Guzman Chavez*, 594 U.S. 523, 536 (2021); *Lanza v. Ashcroft*, 389 F.3d 917, 933 (9th Cir. 2004) (stating that a grant of withholding "only prohibits removal of the petitioner to the country of risk, but does not prohibit removal to a non-risk country").
>
> [] Third-Country Removals
>
> Because the removal proceedings happen on one track, while withholding and CAT proceedings happen on another track, a situation may arise where the Government has an order of removal but no country that an IJ has authorized for that removal.
>
> In certain circumstances, where the Government may not remove an alien to any country covered by that alien's order of removal, the Government may still remove the alien to any "country whose government will accept the alien into that country." 8 U.S.C. § 1231(b)(2)(E)(vii). These are called "third-country removals." As relevant here, a specific carve-out prohibits deportation to countries in which the alien would face persecution or torture:
>
>> Notwithstanding paragraphs [b](1) and [b](2), the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.
>
> 8 U.S.C. § 1231(b)(3)(A). Similarly, under FARRA, Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681–822 (1998) (codified as Note to 8 U.S.C. § 1231)], which codified CAT protections, an alien may not be removed to any country where they would be tortured. *See* 28 C.F.R. § 200.1; 8 C.F.R. §§ 208.16–18, 1208.16–18. In other words, third-country removals are subject to the same mandatory protections that exist in removal or withholding-only proceedings.

*D.V.D.*, 778 F. Supp. 3d at 365–67.

**III.   ANALYSIS**

    **A.   Jurisdiction**

        1.   <u>Habeas Corpus</u>

Under 28 U.S.C. § 2241, the Court has the authority to determine a petition for writ of habeas corpus in which the petitioner asserts she is being held in custody "in violation of the Constitution or laws or treaties of the United States." "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the

7

writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).

Y.T.D. seeks his immediate release from custody, which he contends violates the Constitution of the United States and the APA. (*See* Doc. 1.) Thus, he properly invokes the Court's habeas jurisdiction.

        2.        <u>Judicial Review under the INA</u>

The Immigration and Nationality Act (INA) limits judicial review in many instances. Though 8 U.S.C § 1252(g), precludes this Court from exercising jurisdiction over the executive's decision to "commence proceedings, adjudicate cases, or execute removal orders against any alien," this Court has habeas jurisdiction over the issues raised here, namely the lawfulness of his continued detention and the process required in relation to third country removal. *See Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (holding that § 1252(g) precludes judicial review only as to the three areas specifically outlined in the subsection); *see also Zadvydas v. Davis*, 533 U.S. 678, 687 (2001) (confirming that 28 U.S.C. § 2241 confers jurisdiction on the federal courts to hear cases about the detention of individuals with final removal pending their removal); *J.R. v. Bostock,* No. 2:25-CV-01161-JNW, 2025 WL 1810210, at *3 (W.D. Wash. June 30, 2025) (same as to claims that DHS violated the APA by failing to carry out non-discretionary statutory duties and provide due process to seek withholding of removal).

**B.**      **Preliminary Injunction**

The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 839 n. 7 (9th Cir. 2001) (explaining that the analysis for temporary restraining orders and preliminary injunctions is "substantially identical"). When seeking a TRO or PI, plaintiffs must establish: (1) they are "likely to succeed on the merits" of their claims, (2) they are "likely to suffer irreparable harm in the absence of a preliminary injunction," (3) "the balance of equities tips in [their] favor" and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The moving party has the burden to "make a showing on all four prongs" of the *Winter* test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Thus, the moving party has "the burden of persuasion." *Mazurek v.*

1  *Armstrong*, 520 U.S. 968, 972 (1997); *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2023). The
2  Court may weigh the request for a preliminary injunction with a sliding-scale approach. *Alliance*,
3  at 1135 (9th Cir. 2011). Accordingly, a stronger showing on the balance of hardships may support
4  the issuance of a preliminary injunction where there are "serious questions on the merits … so
5  long as the plaintiff also shows that there is a likelihood of irreparable injury and that the
6  injunction is in the public interest." *Id*. "A preliminary injunction is an extraordinary remedy
7  never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).
8  Preliminary injunctions are intended to "merely to preserve the relative positions of the parties
9  until a trial on the merits can be held, and to balance the equities at the litigation moves forward."
10 *Lackey v. Stinnie*, 604 U.S. ___, 145 S. Ct. 659, 667 (2025) (citations omitted). The status quo
11 refers to "the last uncontested status which preceded the pending controversy." *Tanner Motor*
12 *Livery, Ltd. v. Avis, Inc*., 316 F.2d 804, 809 (9th Cir. 1963) (quoting *Westinghouse Elec. Corp. v.*
13 *Free Sewing Mach. Co*., 256 F.2d 806, 808 (7th Cir. 1958)).

14       Even if the Court's action here constitutes a mandatory injunction,[6] the evidence supports
15 that action. Y.T.D. alleges he has suffered and is suffering violations of his substantive and
16 procedural due process rights and that he will face serious injury if the injunction does not issue.
17 The injunction issued here is on firm legal footing. In this Circuit, due process requires that
18 Petitioner be given afforded reasonable notice and an opportunity to pursue relief in relation to
19 third country removal. These injuries are not capable of redress through monetary compensation.
20 Accordingly, the injunctive relief ordered here is appropriate even under the higher standard for
21 mandatory injunctions.

22                 3.    <u>Likelihood of Success on the Merits</u>

23       This first factor "is the most important" under *Winter*, and "is especially important when a

---

[6] "A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co*., 571 F.3d 873, 879 (9th Cir. 2009) (internal citations omitted). In other words, a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits." *Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983). A mandatory injunction, on the other hand, "orders a responsible party to 'take action.'" *Marlyn Nutraceuticals*, 571 F.3d at 879 (quoting *Meghrig v. KFC W., Inc*., 516 U.S. 479, 484 (1996)). Although subject to a higher standard, a mandatory injunction is permissible when "extreme or very serious damage will result" that is "not capable of compensation in damages," and the merits of the case are not "doubtful." *Id*. (internal citations and quotation marks omitted).

plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023).

### a.    *Unreasonably Lengthy Detention*

Petitioner argues that his continued detention violates the INA, 8 U.S.C. § 1231(a)(6), and due process, as interpreted by the Supreme Court in *Zadvydas*, 533 U.S. 678. (Doc. 22–25.) Under the INA, when an individual is subject to a final order of removal, the government ordinarily must secure removal of that individual from the United States within a period of 90 days, known as the "removal period."[7] 8 U.S.C. § 1231(a)(1)(A). The INA authorizes further detention beyond the removal period under certain circumstances, "including, *inter alia*, those who are removable under 8 U.S.C. § 1227(a)(2) for certain criminal offenses, those determined to be a risk to the community, or those unlikely to comply with the order of removal." *Vaskanyan v. Janecka*, No. 5:25-CV-01475-MRA-AS, 2025 WL 2014208, at *3 (C.D. Cal. June 25, 2025) (citing 8 U.S.C. § 1231(a)(6)).

The Supreme Court set the "presumptively reasonable period of detention" under 8 U.S.C. § 1231(a)(6) at six months. *Zadvydas*, 533 U.S. at 701. After the detention has surpassed the "presumptively reasonable" 6-month period, and "once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id*. Additionally, "as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink" for detention to remain reasonable. *Id*. However, the "6-month presumption does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id*. Nor must an alien show that their removal is entirely impossible to receive habeas relief, only that there is no reasonable likelihood of their removal in the foreseeable future. *Id*. at 702. In the Ninth Circuit,

---

[7] The removal period begins on the latest of the following dates: (i) "[t]he date the order of removal becomes administratively final;" (ii) "[i]f the removal order is judicially reviewed and if a court orders a stay of the removal of the [noncitizen], the date of the court's final order;" or (iii) "[i]f the [noncitizen] is detained or confined (except under an immigration process), the date the [noncitizen] is released from detention or confinement." 8 U.S.C. § 1231 (a)(1)(B)(i)-(iii).

10

"no significant likelihood of removal in the reasonably foreseeable future" means that "the alien must show that he would be unremovable even if the government defeated his petition for review." *Diouf v. Mukasey*, 542 F.3d 1222, 1233 (9th Cir. 2008). In other words, he must be stuck in a "removable-but-unremovable limbo." *Prieto-Romero v. Clark*, 534 F.3d 1053, 1063 (9th Cir. 2008).

The recent Central District of California decision in *Vaskanyan*, 2025 WL 2014208, provides an example of how this burden shifting applies. Vaskanyan, an ethnic Armenian born in the former Soviet Republic of Azerbaijan, was granted refugee status in the United States. *Id*. at *1. Following a lengthy sentence for numerous felony convictions, he was ordered removed to Russia or, alternatively, Azerbaijan. *Id*. at *1, *4. Both countries refused to recognize Vaskanyan as a citizen or issue him travel documents. *Id*. Recognizing that removing petitioner to either country was impossible, DHS pursued removal to Armenia. *Id*. at *5. While Vaskanyan had completed an application for Armenian citizenship, he acknowledged that he did not have the requisite documentation to prove his Armenian ethnicity by descent, and thus, according to the district court, held a reasonable belief that he would be unable to qualify for Armenian citizenship. *Id*. at *4. As a result, Vaskanyan had "good reason to believe" there was no significant likelihood of his removal in the reasonably foreseeable future. *Id*. DHS did not adequately rebut this showing because, even though Vaskanyan's citizenship application to Armenia was pending, DHS did not refute Vaskanyan's showing that he lacked the requisite documentation needed to establish his eligibility for Armenian citizenship. *Id*. at *5. ICE had also requested Vaskanyan to apply for Armenian citizenship only after his post-removal detention period had already exceeded six months in duration. *Id*. Finding that the Government at best had shown "good faith efforts to effectuate" Vaskanyan's deportation and that deporting Vaskanyan was not impossible, the district court found that *Zadvydas* had explicitly rejected such a high standard for release from post-removal detention. *Id*.

Before moving on to apply the *Zadvydas* framework, the Court evaluates a threshold question as to this claim: whether it warrants emergency treatment in the form of a TRO at all. This Court's Local Rule 231(b) provides;

> Timing of Motion. In considering a motion for a temporary restraining order, the Court will consider whether the applicant could have sought relief by motion for preliminary injunction at an earlier date without the necessity for seeking last-minute relief by motion for temporary restraining order. Should the Court find that the applicant unduly delayed in seeking injunctive relief, the Court may conclude that the delay constitutes laches or contradicts the applicant's allegations of irreparable injury and may deny the motion solely on either ground.

Given that Petitioner's removal order became final on February 6, 2025, his presumptively reasonable detention period expired August 6, 2025, yet he did not file this petition until August 29, 2025 and as a result requested urgent treatment of his request for injunctive relief from this already overburdened Court.

Even disregarding this timing, the Court declines to order immediate release on this record under *Zadvydas*. Here, petitioner reports that Kenya, Eritrea, Somalia, and Benin have been mentioned to Y.T.D. as possible countries to which he might be removed. As mentioned, Petitioner has no ties to any of those countries, and states that he would fear removal to them because he believes he would be persecuted in those locations. He generally supports these assertions with citations to State Department human rights reports and other news media sources, but the arguments are not well developed in the briefs.[8] Respondents' overly abbreviated and generic response indicates only that "the government is actively seeking to remove [Petitioner] from the United States." (Doc. 14 at 2.)

In *Vaskanyan,* where the record was more developed and the court concluded that respondent had not rebutted the petitioner's showing regarding the likelihood of removal, the court still did not order the petitioner's immediate release on an emergency basis, opting instead to temporarily bar his removal and require further briefing. *Id*. at *9; *see also Nguyen v. Scott*, No. 2:25-CV-01398, 2025 WL 2165995, at *7–9 (W.D. Wash. July 30, 2025) (even where petitioner met initial burden under *Zadvydas*, respondents, who had presented generic evidence of trends in removal to the target country, were permitted to demonstrated that, with more time to prepare for a preliminary injunction hearing, they may be able to rebut that evidence).

---

[8] Though the Court has reviewed the attachments submitted by Petitioner, it is not entirely obvious from them alone why Petitioner would necessarily be unremovable to all the listed countries.

Here, as the Court indicated at the hearing, the evidence on both sides is generic. Though Petitioner has presented general reasons to believe Y.T.D.'s removal to Kenya, Eritrea, Somalia, and Benin might not be appropriate, the evidence is not specific as to Petitioner. Respondent's evidence is far less specific. But even if the Court were to conclude on this record that Petitioner had met his burden under *Zadvydas* and Respondent had failed to rebut that evidence, release would not be the obvious next step because Y.T.D's situation is complicated by two specific facts in this record: Y.T.D. was previously denied bond because of flight risk; and he apparently stands accused of assaulting an officer inside of an ICE detention facility. For all those reasons, and because Respondents agree to it, the Court will order that Respondents provide Y.T.D. a bond hearing as soon as practicable but no later than 30 days from the date of this order.[9]

        b.      *Notice and Opportunity to be Heard Before Third Country Removal*

Petitioner also argues that "even though Y.T.D. is unlikely to be removed to a third country, if Respondents do attempt to effectuate a third-country removal, they are likely to do so without providing Y.T.D. mandatory statutory and constitutional protections." (Doc. 2, ¶ 62.) As Petitioner has explained (*id.*, ¶ 6), DHS appears to operate under a July 9, 2025 Third Country Removal policy memorandum, described in additional detail below, which sets forth a standard procedure that allows third country removal in as few as 24 hours. (*See* Doc. 1-4.)

On April 18, 2025, the District of Massachusetts certified a class of individuals subject to final removal orders whom DHS has deported or will deport to a country not previously designated as the country or alternative country of removal and not identified in writing in prior proceedings as a country to which the individual would be removed. *D.V.D. v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 355, 378 (D. Mass. 2025). The *D.V.D.* court then granted a preliminary injunction that established procedures DHS and ICE were required to follow before removing a noncitizen to a third country:

---

[9] Considering this order, the Court declines to address Petitioner's separate APA claim, which is premised upon a set of policies Petitioner dubs a "Fear-based Grant Release Policy." (Doc. 1, ¶¶ 28–30; Doc. 2, ¶ 55.) The Court has serious doubts about the viability of this claim, given that an APA claim arising under 5 U.S.C. § 706(2)(A) must challenge a "final agency action," *see* 5 U.S.C. § 704, and Petitioner's APA claim does not appear to do so. Even assuming the APA claim is cognizable, nothing in the policies referenced in the Petition suggests those policies would entitle Petitioner to immediate release or to a bond hearing on any determinate schedule.

> All removals to third countries, i.e., removal to a country other than the country or countries designated during immigration proceedings as the country of removal on the non-citizen's order of removal, see 8 U.S.C. § 1231(b)(1)(C), must be preceded by written notice to both the non-citizen and the non-citizen's counsel in a language the non-citizen can understand. Following notice, the individual must be given a meaningful opportunity, and a minimum of ten days, to raise a fear-based claim for CAT protection prior to removal. *See id*. If the non-citizen demonstrates "reasonable fear" of removal to the third country, Defendants must move to reopen the non-citizen's immigration proceedings. *Id*. If the non-citizen is not found to have demonstrated a "reasonable fear" of removal to the third country, Defendants must provide a meaningful opportunity, and a minimum of fifteen days, for the non-citizen to seek reopening of their immigration proceedings.

*D.V.D. v. U.S. Dep't of Homeland Sec.*, No. CV 25-10676-BEM, 2025 WL 1453640, at *1 (D. Mass. May 21, 2025) (internal record citations omitted), *reconsideration denied sub nom.* No. CV 25-10676-BEM, 2025 WL 1495517 (D. Mass. May 26, 2025). On June 23, 2025, the United States Supreme Court stayed the district court's preliminary injunction pending appeal in the First Circuit, with no member of the majority offering analysis. *Dep't of Homeland Sec. v. D.V.D.*, ––– U.S. –––, 145 S. Ct. 2153 (2025).

On July 9, 2025, ICE issued a memorandum updating agency officials on its policy regarding third country removals after the Supreme Court's order in *D.V.D*. That policy states:

> Effective immediately, when seeking to remove an [noncitizen] with a final order of removal—other than an expedited removal order under Section 235(b) of the Immigration and National Act (INA)—to an alternative country as identified in section 241(b)(1)(C) of the INA, ICE must adhere to Secretary of Homeland Security Kristi Noem's March 30, 2025 memorandum, Guidance Regarding Third Country Removals, as detailed below. A 'third country' or 'alternative country' refers to a country other than that specifically referenced in the order of removal.
>
> If the United States has received diplomatic assurances from the country of removal that aliens removed from the United States will not be persecuted or tortured, and if the Department of State believes those assurances to be credible, the alien may be removed without the need for further procedures. ICE will seek written confirmation from the Department of State that such diplomatic assurances were received and determined to be credible. HSI and ERO will be made aware of any such assurances.

(Doc. 1-4 (Ex. 7) at 2.) In "all other cases" ICE must comply with the following procedures:

- An ERO officer will serve on the alien the attached Notice of

Removal. The notice includes the intended country of removal and will be read to the alien in a language he or she understands.

- ERO will <u>not</u> affirmatively ask whether the alien is afraid of being removed to the country of removal.

- ERO will generally wait at least 24 hours following service of the Notice of Removal before effectuating removal. In exigent circumstances, ERO may execute a removal order six (6) or more hours after service of the Notice of Removal as long as the alien is provided reasonable means and opportunity to speak with an attorney prior to removal.

  - Any determination to execute a removal order under exigent circumstances less, than 24 hours following service of the Notice of Removal must be approved by the DHS General Counsel, or the Principal Legal Advisor where the DHS General Counsel is not available.

- If the alien <u>does not</u> affirmatively state a fear of persecution or torture if removed to the country of removal listed on the Notice of Removal within 24 hours, ERO may proceed with removal to the country identified on the notice. ERO should check all systems for motions as close in time as possible to removal.

  - If the alien <u>does affirmatively state</u> a fear if removed to the country of removal listed on the Notice of Removal, ERO will refer the case to U.S. Citizenship and Immigration Services (USCIS) for a screening for eligibility for protection under section 241(b)(3) of the INA and the Convention Against Torture (CAT). USCIS will generally screen the alien within 24 hours of referral.

  - USCIS will determine whether the alien would more likely than not be persecuted on a statutorily protected ground or tortured in the country of removal.

  - If USCIS determines that the alien has not met this standard, the alien will be removed.

  - If USCIS determines that the alien has met this standard and the alien was not previously in proceedings before the immigration court, USCIS will refer the matter to the immigration court for further proceedings. In cases where the alien was previously in proceedings before the immigration court, USCIS will notify the referring immigration officer of its finding, and the immigration officer will inform ICE. In such cases, ERO will alert their local Office of the Principal Legal Advisor (OPLA) Field Location to file a motion to reopen with the immigration court or the Board of Immigration Appeals,

15

>as appropriate, for further proceedings for the sole purpose of determining eligibility for protection under section 241(b)(3) of the INA and CAT for the country of removal. Alternatively, ICE may choose to designate another country for removal.

(*Id*. at 2–3.) The policy also indicates that the "Supreme Court's stay of removal does not alter any decisions issued by any other courts as to individual aliens regarding the process that must be provided before removing alien to a third country." (*Id*. at 3.)

Notwithstanding the stay of the *D.V.D.* preliminary injunction, at least one district court explicitly found the terms of that injunction was an appropriate means to avoid irreparable harm faced by a petitioner facing the possibility of third country removal without adequate notice and an opportunity to be heard. *Vaskanyan v. Janecka*, No. 5:25-CV-01475-MRA-AS, 2025 WL 2014208, at *7 (C.D. Cal. June 25, 2025). Without relying on *D.V.D.*, in *Nguyen v. Scott*, No. 2:25-CV-01398, 2025 WL 2419288, at *18–19 (W.D. Wash. Aug. 21, 2025), the court found that ICE's July 9, 2025 policy was likely inconsistent with Ninth Circuit due process precedent:

>As another court in this district has previously held, a "noncitizen must be given sufficient notice of a country of deportation that, given his capacities and circumstances, he would have a reasonable opportunity to raise and pursue his claim for withholding of deportation." *Aden v. Nielsen*, 409 F. Supp. 3d 998, 1009 (W.D. Wash. 2019) (first citing *Mathews v. Eldridge*, 424 U.S. 319, 349 (1976); and then citing *Kossov v. I.N.S.*, 132 F.3d 405, 408 (7th Cir. 1998)). "The guarantee of due process includes the right to a full and fair hearing, an impartial decisionmaker, and evaluation of the merits of his or her particular claim." *Aden*, 409 F. Supp. 3d at 1010 (citing *Torres-Aguilar v. INS*, 246 F.3d 1267, 1270 (9th Cir. 2001)). "[B]oth the due process clause and the governing statute place the burden on the government—regardless of whether the country of deportation is designated during or after the removal hearing—to provide a meaningful opportunity to be heard on asylum and withholding claims." *Id*. This cannot be satisfied by simply allowing the noncitizen to file a motion to reopen their removal proceedings; rather, the removal proceedings must be reopened so that a hearing can be held. *Id*. at 1011.
>
>The requirements set forth in *Aden* flow directly from binding Ninth Circuit precedent about due process protections before removal to a third country. "Failing to notify individuals who are subject to deportation that they have the right to apply . . . for withholding of deportation to the country to which they will be deported violates both INS regulations and the constitutional right to due process." *Andriasian v. I.N.S.*, 180 F.3d 1033, 1041 (9th Cir. 1999) (citing

> *Kossov*, 132 F.3d at 408–09); *see also Sadychov v. Holder*, 565 F. App'x 648, 651 (9th Cir. 2014) ("[S]hould circumstances change such that Azerbaijan is the designated country of removal, the agency must provide Sadychov with notice and an opportunity to reopen his case for full adjudication of his claim of withholding of removal from Azerbaijan."). "In the context of country of removal designations, last minute orders of removal to a country may violate due process if an immigrant was not provided an opportunity to address his fear of persecution in that country." *Najjar v. Lynch*, 630 Fed. App'x 724 (9th Cir. 2016) (citing *Andriasian*, 180 F.3d at 1041); *El Himri v. Ashcroft*, 378 F.3d 932, 938 (9th Cir. 2004).
>
> ***
>
> [ICE's July 9, 2025] policy contravenes Ninth Circuit law, as laid out above. *See Andriasian*, 180 F.3d at 1041; *Himri*, 378 F.3d at 938–39; *Aden,* 409 F. Supp. 3d at 1004. It would be impossible to comply both with Ninth Circuit precedent and the policy. *See Andriasian*, 180 F.3d at 1041; *Aden*, 409 F. Supp. 3d at 1009.

(Internal record citations omitted.)

Respondent argues that Petitioner is not likely to succeed on his request for an injunction imposing procedural protections on the third country removal process because Petitioner is asking the Court to issue an advisory opinion. (Doc. 14 at 8.) Presumably, Respondent is trying to suggest that Petitioner has not demonstrated immediacy of injury for purposes of Article III standing. One seeking injunctive relief to prevent future injury must "establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue, and that the threatened injury is certainly impending." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC)*, 528 U.S. 167, 180 (2000) (citation omitted). Here, both parties are—to a certain extent—talking out of both sides of their mouths. For purposes of supporting his arguments under *Zadvydas*, Petitioner argues that his removal is not likely, while simultaneously arguing that DHS may seek to remove Petitioner to a third country imminently without proper notice or opportunity to be heard. Respondent simultaneously argues that DHS is actively pursuing third country removal while also remaining vague about the procedures DHS will apply once a third country is identified. Yet Petitioner also points out in reply that the default procedural structure without an injunction appears to be set forth in DHS's March 30 and July 9, 2025 policy memoranda, which as the cases discussed above indicate, are insufficient for due process purposes. Petitioner also points to numerous examples of cases involving individuals who

DHS has attempted to remove to third countries with little or no notice or opportunity to be heard. (*See* Doc. 15, ¶ 25 (listing cases).) On balance, on this record, the Court finds that there is a sufficiently imminent risk that Petitioner will be subjected to improper process in relation to any third country removal to warrant imposition of an injunction requiring additional process.

### 4. Irreparable Harm

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 247, 272 (1976)). Moreover, "[t]he Ninth Circuit has recognized 'irreparable harms imposed on anyone subject to immigration detention' including 'the economic burdens imposed on detainees and their families as a result of detention.'" *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-970 (9th Cir. 2011) (the inability to pursue a petition for review may constitute irreparable harm). As the *D.V.D.* District Court explained, the irreparable harm resulting from third-country removal without sufficient opportunity to apply for fear-based protection "is clear and simple: persecution, torture, and death. It is hard to imagine harm more irreparable." *D.V.D.*, 778 F. Supp. 3d at 391.

### 5. Balance of the Harms/Public Interest

Because the interest of the government is the interest of the public, the final two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court agrees with the analysis of *Vaskanyan* on this prong of the injunctive relief analysis:

> "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002), *abrogated on other grounds by Winter*, 555 U.S. 7). In cases implicating removal, "there is a public interest in preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436. Although there is a countervailing "public interest in prompt execution of removal orders," *id.*, it is well-established that "our system does not permit agencies to act unlawfully even in pursuit of desirable ends," *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 766 (2021) (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952)); *see also Am. Fed'n of Gov't E*mps., AFL-CIO v. Trump, No. 25-CV-03698-SI, 2025 WL 1482511, at *27 (N.D. Cal. May 22, 2025) (finding that injunctive relief would serve the public interest because "[t]here is generally no public interest in the perpetuation of unlawful

> agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations" (quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). Thus, these factors weigh strongly in favor of issuing a TRO [to provide additional procedural protections prior to third country removal].

2025 WL 2014208, at *7–8. For these reasons, the Court concludes that the balance of the equities and public interest weigh in favor of granting Y.T.D. additional procedural protections against third country removal as well.

### 6. Bond

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court has "discretion as to the amount of security required, if any," and it "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (citation modified). Because "the [Government] cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations," *Zepeda*, 753 F.2d at 727, and because the current facts do not justify release, the Court finds that no security is required here.

## CONCLUSION AND ORDER

For the foregoing reasons, the Court **ORDERS**:

1. Petitioner's Motion for Temporary Restraining Order (Doc. 2) is converted to a Motion for Preliminary Injunction, and it is **GRANTED IN PART**.

2. Respondents are **PERMANENTLY ENJOINED AND RESTRAINED** from effectuating Petitioner's third country removal without first:

    (a) Providing him and his counsel with written notice in a language the Petitioner can understand.

    (b) Following notice, Petitioner must be given a meaningful opportunity, and a minimum of ten days, to raise a fear-based claim for CAT protection prior to

removal.

  (c) If Petitioner demonstrates "reasonable fear" of removal to the third country, Defendants must move to reopen his immigration proceedings.

  (d) If the non-citizen is not found to have demonstrated a "reasonable fear" of removal to the third country, Defendants must provide a meaningful opportunity, and a minimum of fifteen days, for the non-citizen to seek reopening of his immigration proceedings.

3. Absent a reasonable stipulation to further modify the briefing schedule:

  (a) Respondent **SHALL** file its brief on the merits within 45 days of the date of this order; and

  (b) Petitioner **SHALL** have 14 additional days to file any reply.

IT IS SO ORDERED.

Dated:  **September 18, 2025**    */s/ Jennifer L. Thurston*
                UNITED STATES DISTRICT JUDGE